**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **CITIZENS FOR RESPONSIBILITY AND** | ) | |
| **ETHICS IN WASHINGTON** | ) | |
| 455 Massachusetts Ave., N.W., Sixth Floor | ) | |
| Washington, D.C. 20001, | ) | |
| | ) | |
| **NOAH BOOKBINDER** | ) | |
| 10206 Brookmoor Dr. | ) | Civil Action No. |
| Silver Spring, MD 20901 | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **FEDERAL ELECTION COMISSION** | ) | |
| 999 E Street, N.W. | ) | |
| Washington, D.C. 20463, | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

1.      This is an action for injunctive and declaratory relief under the Federal Election

Campaign Act of 1971 ("FECA" or "the Act"), 52 U.S.C. § 30109(a)(8)(C), and the

Administrative Procedure Act, 5 U.S.C. § 706, challenging as arbitrary, capricious, an abuse of

discretion, and contrary to law the dismissal by the Federal Election Commission ("FEC" or

"Commission") of an administrative complaint by Citizens for Responsibility and Ethics in

Washington ("CREW") and Noah Bookbinder (collectively, "Plaintiffs") against Murray Energy

Corporation ("Murray Energy"), Murray Energy Corporation Political Action Committee

("Murray Energy PAC" or "MEPAC"), and Robert Murray, Chairman, President, and Chief

Executive Officer of Murray Energy Corporation (collectively, "Respondents") for their

unlawful coercion of company employees to make contributions to Murray Energy PAC and

federal candidates, false reporting of contributions made and knowingly accepted in the name of another, and making of corporate contributions.

2.      Before the 2012 election, Robert Murray personally threatened employees by letter and in company meetings with termination if the employees failed to contribute to the company's political action committee.  Murray Energy employees have stated that they felt under constant pressure to make contributions and that their jobs were at stake if they did not make the contributions Robert Murray expected them to.  In a September 15, 2012 letter, Robert Murray sent a request to recalcitrant employees threatening them with "eliminat[ion]" if they did not "positively respond to [his] request."  One employee even brought suit against Murray Energy and Robert Murray in September 2014 accusing them of coercing her political activity.  Additionally, the Federal Mine Safety and Health Review Commission found parallel evidence of company employee intimidation practices, finding that Murray Energy intimidated employees into failing to report safety violations and threatened their jobs if they did report violations.

3.      Respondents used not only a stick to compel contributions, they also offered a carrot.  Murray Energy and Robert Murray would reimburse employees for their contributions to the PAC by giving bonuses from corporate treasury funds that Mr. Murray would personally approve.  Mr. Murray personally decided how much each employee received in bonuses and Respondents acknowledge that the bonuses served as an "incentive" to contribute.

4.      The FECA, however, prohibits employers from threatening employees and coercing their political contributions.  It further prohibits the laundering of contributions through such employees, particularly where those funds come from corporate coffers and are used to make unlawful corporate contributions.  Accordingly, the FEC dismissal of Plaintiffs' complaint against the Respondents was contrary to law, in violation of the FECA.

## JURISDICTION AND VENUE

5.      This Court has both subject matter jurisdiction over this action and personal

jurisdiction over the parties pursuant to 52 U.S.C. § 30109(a)(8)(A) and 5 U.S.C. § 702.  This

Court also has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 2201(a), and 2202.

Venue lies in this district under 52 U.S.C. § 30109(a)(8)(A) and 28 U.S.C. § 1391(e).

## PARTIES

6.      Plaintiff CREW is a non-profit, non-partisan corporation organized under section

501(c)(3) of the Internal Revenue Code.

7.      CREW is committed to protecting the rights of citizens to be informed about the

activities of government officials, ensuring the integrity of government officials, protecting our

political system against corruption, and reducing the influence of money in politics.  CREW

works to advance reforms in the areas of campaign finance, lobbying, ethics, and transparency.

Further, CREW seeks to ensure that campaign finance laws are properly interpreted, enforced,

and implemented.

8.      To advance its mission, CREW uses a combination of research, litigation,

advocacy, and public education to disseminate information to the public about public officials

and their actions, as well as the outside influences that have been brought to bear on those

actions.  A core part of this work is examining and exposing the special interests that have

influenced our elections and elected officials and using that information to educate voters

regarding the integrity of public officials, candidates for public office, the electoral process, and

our system of government.

9.      Toward this end, CREW monitors the activities of those who run for federal

office as well as those groups financially supporting candidates for office or advocating for or

against their election.  CREW regularly reviews campaign finance reports that groups, candidates, and political parties file with the FEC disclosing their expenditures and, in some cases, their contributors.  Using the information in those reports, CREW, through its website, press releases, reports, and other methods of distribution, publicizes the role of these individuals and entities in the electoral process and the extent to which they have violated federal campaign finance laws.

10.     CREW also files complaints with the FEC when it discovers violations of the FECA.  Publicizing violations of the FECA and filing complaints with the FEC serve CREW's mission of keeping the public, and voters in particular, informed about individuals and entities that violate campaign finance laws and deterring future violations of campaign finance laws.

11.     CREW is hindered in carrying out its core programmatic activities when those individuals and entities that attempt to influence elections and elected officials are able to keep their identities hidden.  Likewise, the FEC's refusal to properly administer the campaign finance laws, particularly the FECA's reporting requirements, hinders CREW in its programmatic activity, as compliance with those reporting requirements often provides CREW with the only source of information about those individuals and groups funding the political process.  As a result of the FEC's refusal to enforce the FECA's disclosure provisions, organizations and individuals like Murray Energy and Robert Murray are able to launder their contributions through third parties.  This deprives CREW of information critical to advancing its ongoing mission of educating the public to ensure the public continues to have a vital voice in our political process and government decisions.

12.     A part of CREW's work in carrying out its central mission focuses on so-called "pay-to-play" schemes.  Toward that end, CREW looks for correlations between donations to the

campaign of a member of Congress or candidate and that member's subsequent congressional activities, including advocating for policies and legislation that serve the interests of the member's donors.  Information that an individual or entity made a large-dollar contribution may be very revealing about the influences that donor has brought to bear on the member post-election.  Without information about the individuals and entities funding the political activities of organizations and individuals like Murray Energy and Robert Murray, CREW is stymied in fulfilling its central mission.

13.     As an example, in May 2013, CREW issued a report, *Rise of the Machines*, detailing the growing political influence of high-frequency traders in Washington.  CREW's analysis was based in large part on the lobbying and campaign contribution records of 48 companies specializing in high frequency trading.  That data revealed that between the 2008 and 2012 election cycles, the campaign contributions of these firms increased by 673 percent, from $2.1 million during the 2008 election cycle to $16.1 million during the 2012 cycle.  CREW was able to obtain this information because of the disclosure requirements to which the organizations receiving those contributions—federal candidates, party committees, PACs, and super PACs—are subject under the FECA.

14.     As another example, CREW published *Stealth Donors*, a December 2012 report on donors who gave more than $1,000,000 to super PACs trying to influence the 2012 election. The report revealed a dozen donors with policy or business interests that depended on the outcome of the elections, but whose efforts to sway voters largely were out of the public view. CREW obtained the information used in this report from information the FECA requires political committees to disclose.

15.     For organizations like Murray Energy and individuals like Robert Murray that refuse to comply with the FECA's disclosure requirements and launder unlawful contributions through the intimidation and coercion of their employees, CREW has no access to information detailing the true sources of the money used to fund the political activities of federal candidates and outside groups like Murray Energy PAC.  As a result, CREW is harmed when the FEC fails to properly administer the FECA, particularly the statute's reporting requirements, thereby limiting CREW's ability to obtain and review campaign finance information.

16.     Plaintiff Noah Bookbinder is the executive director of CREW.  He is a citizen of the United States and a registered voter and resident of the state of Maryland.  As a registered voter, Mr. Bookbinder is entitled to receive all the information the FECA requires those engaged in political activities to report publicly.  He is further entitled to the FEC's proper administration of the provisions of the FECA.  Mr. Bookbinder is harmed in exercising his right to an informed vote when a political committee fails to report the true source of its contributions, as the FECA requires.

17.     When Plaintiffs file complaints against violators of the FECA, they rely on the FEC, as the exclusive civil enforcement authority, to comply strictly with the FECA when making its enforcement decisions.  *See* 52 U.S.C. § 30107(e).  Plaintiffs are harmed and are "aggrieved" parties when the FEC dismisses their complaints contrary to the FECA, refuses to enforce the FECA's mandatory disclosure requirements, or otherwise acts contrary to the requirements of the FECA.  *See* 52 U.S.C. § 30109(a)(8)(C).

18.     Defendant FEC is the federal agency established by Congress to oversee the administration and civil enforcement of the FECA.  *See* 52 U.S.C. §§ 30106, 30106(b)(1).

## STATUTORY AND REGULATORY FRAMEWORK

### *Coercion of Employee Contributions*

19.     The FECA and the FEC regulations prohibit a corporation from making direct contributions to federal candidates.  52 U.S.C. § 30118; 11 C.F.R. § 114.2.  The laws authorize a corporation, however, to create a "separate segregated fund" ("SSF") that may be used to fund political activities, including direct candidate contributions.  52 U.S.C. § 30118(b)(2)(C); 11 C.F.R. § 114.5.  The separate segregated fund, often referred to as a "political action committee" or "PAC," may not accept corporate treasury funds—it is limited to soliciting and accepting contributions from employees or other specified individuals—although the SSF, but may be controlled by the corporation.  52 U.S.C. § 30118(b); 11 C.F.R. §§ 114.5(d), 114.6.

20.     Nevertheless, the FECA and FEC regulations specifically prohibit a PAC from making a contribution or expenditure by utilizing money "secured by physical force, job discrimination, financial reprisals, or the threat of force, job discrimination, or financial reprisals; . . . or other moneys required . . . as a condition of employment."  52 U.S.C. § 30118(b)(3)(A); 11 C.F.R. § 114.5(a)(1).

### *Reporting Contributions*

21.     The FECA and FEC regulations require those accepting contributions to report the source of the contribution.  52 U.S.C. § 30104(b)(3), (c); 11 C.F.R. §§ 104.3, 114.5(e)(3).  To ensure accuracy in reporting, the law prohibits a person from making a contribution in the name of another person and prohibits a person from knowingly accepting a contribution made by one person in the name of another.  52 U.S.C. § 30122; 11 C.F.R. § 110.4(b)(1).

***Corporate Contributions***

22.     Although corporate entities may make independent expenditures and may fund electioneering communications, the FECA and FEC regulations bar corporations from using corporate funds to make contributions in connection with a federal election.  52 U.S.C. § 30118; 11 C.F.R. § 114.2(a).

***Enforcement***

23.     Under the FECA, any person who believes there has been a violation of the Act may file a sworn complaint with the FEC.  52 U.S.C. § 30109(a)(1).  Based on the complaint, the response from the person alleged to have violated the Act, and any recommendation of the Office of General Counsel ("OGC"), the Commission then votes on whether there is "reason to believe" a violation of the FECA has occurred.  52 U.S.C. § 30109(a)(2).  A "reason to believe" exists where a complaint "credibly alleges" a violation of the FECA "may have occurred."  Statement of Policy Regarding Commission Action in Matters at the Initial State in the Enforcement Process, 72 Fed. Reg. 12545, 12545 (Mar. 16, 2007).  If the FEC finds there is "reason to believe" a violation of the FECA may have occurred, the FEC must notify the respondents of that finding and "shall make an investigation of such alleged violation."  52 U.S.C. § 30109(a)(2).

24.     After the investigation, the OGC may recommend the FEC vote on whether there is "probable cause" to believe the FECA has been violated.  52 U.S.C. § 30109(a)(3).  The OGC must notify the respondents of any such recommendation and provide them with a brief stating the position of the OGC on the legal and factual issues presented, to which the respondents may reply.  *Id.*  The respondents may then submit a brief stating their position on the legal and factual issues of the case, and their reply to the brief of general counsel.  *Id.*

25.     Upon consideration of these briefs, the FEC may then determine whether there is "probable cause" to believe a respondent "has committed" a violation of the FECA.  52 U.S.C. § 30109(a)(4)(A)(i).  If the FEC finds probable cause to believe a violation of the FECA has occurred, the FEC must attempt for at least 30 days, but not more than 90 days, to resolve the matter "by informal methods of conference, conciliation and persuasion," *id.*, a process that does not involve the complainant.

26.     If the FEC is unable to settle the matter through informal methods, it may institute a civil action for legal and equitable relief in the appropriate United States district court.  52 U.S.C. § 30109(a)(6)(A).  In any action instituted by the FEC, a district court may grant injunctive relief as well as impose monetary penalties.  52 U.S.C. § 30109(a)(6)(B)–(C).

27.     If at any stage of the proceedings the FEC dismisses a complaint, any "party aggrieved" may seek judicial review of that dismissal in the United States District Court for the District of Columbia.  52 U.S.C. § 30109(a)(8)(A).  All petitions from the dismissal of a complaint by the FEC must be filed "within 60 days after the date of the dismissal."  52 U.S.C. § 30109(a)(8)(B).

28.     The district court reviewing the FEC's dismissal of a complaint may declare the FEC's actions "contrary to law."  52 U.S.C. § 30109(a)(8)(C).  The court also may order the FEC "to conform with such declaration within 30 days."  *Id.*  If the FEC fails to abide by the court's order, the FECA provides the complainant with a private right of action, brought in the complainants' own name, "to remedy the violation involved in the original complaint."  *Id.*

## FACTUAL BACKGROUND

29.     At least as early as 2012, and likely for many years before and after, Murray Energy and Robert Murray coerced employees to make contributions to the Murray Energy PAC

and to federal candidates by threatening employees with financial reprisals, including the loss of their jobs, if they failed to contribute.  *See* Alec MacGillis, <u>Coal Miner's Donor:  A Mitt Romney Benefactor and His Surprisingly Generous Employees</u>, The New Republic, Oct. 4, 2012 (attached as Exhibit A).

30.      Murray Energy employees have stated that they are under constant pressure to make contributions or lose their jobs.  One employee said that "[t]here's a lot of coercion."  "I just wanted to work, but you feel this constant pressure that, if you don't contribute, your job's at stake.  You're compelled to do this whether you want to or not."  A second employee explained: "They will give you a call if you're not giving . . . .  It's expected you give Mr. Murray what he asks for."  *See id.* at 1–2.

31.      Mr. Murray, as the Chairman, President, and Chief Executive Officer of Murray Energy, personally threatened employees of the company with the loss of their jobs if they failed to contribute to the Murray Energy PAC.  In a September 15, 2012 letter on corporate stationary that was hand-delivered to employees who had not given, Mr. Murray complained about the response to a recent request for additional contributions to the PAC, saying: "We have only a little over a month left to go in this election fight.  If we do not win it, the coal industry will be eliminated and so will your job, if you want to remain in this industry.  Please positively respond to our request."  Letter from Robert E. Murray, CEO, Murray Energy, to Unknown Recipients (Sept. 15, 2012) (attached as Exhibit B).

32.      Murray Energy employees stated that the pressure to give begins as soon as employees enter the company.  "At the time of hiring, supervisors tell employees that they are expected to contribute to the PAC by automatic payroll deduction—typically 1 percent of their

salary . . . ."  One employee said he "was told [in his interview] that [he] would be expected to make political contributions—that [Mr. Murray] just expected that."  *See* Exhibit A at 3.

33.     In addition, according to a separate complaint filed with the FEC, "Murray Energy employees at the Murray Coal plant in Beallsville, Ohio "were required to attend a political rally on or about August 14, 2012 in support of presidential candidate, Mitt Romney."  Compl. (MUR 6651) (Sept. 25, 2012) (attached as Exhibit C).  According to that FEC complaint, "[t]hese worker's attendance at the Romney rally during normal work hours was mandatory, according to Chief Operations Officer Roy Moore."  *Id.*  "This appears to have caused several workers to fear detrimental job action if they did not attend."  *Id.*  Although the FEC's Office of General Counsel found that the available information suggested Murray Energy required employees to attend the rally, *see* First General Counsel's Report 13 (MUR 6651) (Mar. 20, 2014) (attached as Exhibit D), the Commission deadlocked three to three, *see* Certification (MUR 6651) (June 18, 2015) (attached as Exhibit E), and the case was dismissed.

34.     In September 2014, another Murry Energy subsidiary employee sued Murray Energy and Robert Murray, alleging that the two wrongfully terminated her for her failure to contribute to Murray Energy PAC as requested.  She alleged that, "[d]uring her employment with the Murray defendants, and even after she was fired, [she] received written requests from defendant Murray to contribute to certain political candidates."  Compl. ¶ 12, *Cochenour v. Murray*, No. 14-c-681 (W. Va. Sept. 4, 2014) (attached as Exhibit F).

35.     The employee further alleged that "Defendant Murray's letters to [her] and, on information and belief, to other employees of Murray defendants, included the names of specific candidates and a request from Mr. Murray that [she] contribute a specific amount to each candidate."  *Id.*  ¶ 13.  "Not only did Mr. Murray name candidates and specify the amount to be

contributed to each candidate but he also required that the political contributions he solicited from [her] be returned directly to him in a self-addressed envelope that he enclosed with each of his letters to her." *Id.* ¶ 14.  According to her complaint, Murray Energy and Robert Murray would "send[] the letters approximately every month until after [her] termination from employment," *id.* ¶ 15, and Mr. Murray kept track of which employees contributed and which did not, *id.* ¶ 20.  The employee further alleged that she was eventually terminated "because of her failure to donate to the candidates of Mr. Murray's choice." *Id.* ¶ 34.  The lawsuit was eventually settled out of court.  Agreed Order of Dismissal, *Cochenour v. Murray*, No. 1:14-cv-164 (N.D. W. Va. July 27, 2015).

36.     In one of the letters to which the employee referred, which she alleged was typical of the letters she received, *id.* ¶ 16, Mr. Murray asked her to donate $200 each to four Senate Candidates:  Scott Brown, Edward Gillespie, Terri Lynn Land, and Mike McFadden.  Exhibit F at 11–12 (May 29, 2014 letter from Robert E. Murray to Jean F. Cochenour).

37.     Murray Energy and Robert Murray's penchant for coercion is further supported by a complaint filed by the United States Department of Labor against the company and Mr. Murray.  In that complaint, the U.S. Department of Labor alleged Murray Energy and Mr. Murray threatened employees with loss of their job if they reported unsafe working conditions.  An Administrative Law Judge with the Federal Mine Safety and Health Review Commission agreed with the allegations, finding that Murray Energy and Mr. Murray did indeed intimidate employees in violation of the law.  Decision and Order 10, *Sec'y of Labor v. Marshall County Coal. Co.*, No. WEVA 2015-583-D (Fed. Mine Safety and Health Review Comm'n, Nov. 18, 2015) (attached as Exhibit G), *aff'd*, WEVA 2015-583-D (Fed. Mine Safety and Health Review Comm'n, Feb. 10, 2016).

38.     In addition to these threats, Respondents would encourage contributions by "incentiv[izing]" employees with bonuses, reimbursing employees for their contributions.   One Murray Energy employee stated that he was told during his interview that, while he was expected to contribute as Mr. Murray demanded, he "was told not to worry because [his] bonuses would more than make up what [he] would be asked to contribute."  *See* Exhibit A at 3.  Employees were aware that refusing to contribute could result in "missing out on [those] bonuses."  *Id.* at 1. Moreover, Murray Energy General Counsel Mike McKown confirmed to *The New Republic* that Mr. Murray personally decided how much each employee received in bonuses each month.  "It's Mr. Murray's view of what the employee's contribution was to the company that month."  *Id.* at 4.

39.     In responding to these allegations, Respondents admitted that Mr. Murray personally determines the amounts each employee will receive in a bonus.  They further admitted that Mr. Murray is personally aware of each employee's political contributions, whether to Murray Energy PAC or to federal candidates, and that the identities of reluctant employees were frequently discussed by Mr. Murray and other top management.  Additionally, Respondents admitted that that bonuses served as an "incentive" for employees to contribute.  Finally, Respondents admitted that Mr. Murray looks to the employee's "contribution[s]" to determine the amount of bonus he will authorize to be paid to the employee.  Those admissions support the account of a Murray Energy employee that the bonuses would cover his contributions—the contributions he was expected to make to Respondents' preferred candidates and sources—and that a failure to contribute could mean missing out on the bonus.  Exhibit A at 1, 3.

### *Administrative Proceedings*

40.     On October 5, 2012, Plaintiff CREW and Melanie Sloan filed a complaint with the FEC against Respondents Robert Murray, Murray Energy, and Murray Energy PAC for violations of the FECA ("MUR 6661").  Based on the reporting by *The New Republic*, the complaint alleged that Respondents violated the FECA by coercing employee donations, causing contributions to be made in the name of another and knowingly accepting such contributions, and using corporate funds to make contributions in connection with a federal election.

41.     On April 3, 2013, the Respondents filed a response to Plaintiffs' complaint.

42.     With regard to the alleged coercion, Respondents downplayed the seriousness of the allegedly coercive activity, claiming that the allegations merely reflect "the normal discomfort some people have when periodically asked to make a contribution."  However, Respondents do not dispute the activity occurred and that employees were "pressur[ed]" to contribute, contesting only that they were not personally aware of any of the threats actually being carried out.

43.     With regards to the allegation of reimbursing employees for political contributions, Respondents did not dispute that employees were paid bonuses to compensate them for their contributions.  Rather, they acknowledged that bonuses served as an "incentive" for employees to contribute, and only disputed the ability of the Commission to rely on an anonymous source to support an investigation.

44.     On September 16, 2014, Plaintiff CREW and Ms. Sloan submitted a supplement to the complaint.  The supplement provided the Commission with information related to Jean F. Cochenour's lawsuit against Murray Energy and Robert Murray, as well as a copy of her

complaint.  CREW and Ms. Sloan requested that the FEC expand its investigation to include Ms. Cochenour's allegations.

45.     On November 17, 2014, the Respondents filed a response to Plaintiffs' September 16, 2014 supplement.  Although Respondents contested the employee's allegation that she was terminated in part for her failure to contribute as required by Respondents,  Respondents did not and could not dispute the employee's allegation that she and other employees received coercive solicitations from Respondents.

46.     On November 18, 2015, Plaintiffs supplemented their complaint by substituting Noah Bookbinder for Melanie Sloan as complainant.

47.     On February 1, 2016, the FEC's OGC issued the First General Counsel's Report on Plaintiffs' complaint (the "Report").  The Report, looking to the complaints, the response, and sworn deposition testimony from the *Cochenour* case, found that the "Respondents' solicitations, follow-up memos, and tracking activities rise to the level of coercion" and that the Commission should therefore find reason to believe the Respondents' violated 52 U.S.C. § 30118(a) and 11 C.F.R. § 114.2(f) "by coercing Murray Energy employees to make contributions to federal candidates and participate in fundraising activities supporting federal candidates."  The Report also recommended the Commission find reason to believe that Murray Energy PAC and Michael G. Ruble in his official capacity as treasurer for the PAC violated 52 U.S.C. § 30118(b)(3)(A) and 11 C.F.R. § 114.5(a)(1) by accepting such coerced contributions.  The Report further recommended the Commission postpone action on the allegations that Murray Energy used its bonus program to pay for PAC contributions and reimburse candidate contributions and that such reimbursements resulted in prohibited corporate contributions, in violation of 52 U.S.C.

§§ 30122 or 30118, until the FEC completed its investigation into Respondents' coercive activities.

48.     With regard to whether Robert Murray and Murray Energy violated 52 U.S.C. § 30118(a) and 11 C.F.R. § 114.2(f), the OGC emphasized that "coercion may be found on the basis of actual or threatened reprisals."  Moreover, the OGC noted, Respondents' alleged lack of knowledge about "actual reprisals does not refute the alleged coercion."  The OGC found the solicitations dated August 28 and September 15, 2010 lacked anti-coercion information required by the Act and Commission regulations.  Additionally, the OGC found that Mr. Murray and Murray Energy's solicitations not only left out this information, but also included the "implied threat" of "potential job-related reprisals" for not contributing.  Indeed, the OGC found this threat in the "pressure to participate" to avoid consequences from not doing so; in Mr. Murray's "affirmatively maintained lists" circulated to managers with "direct instructions" to "ensure that those employees complied with fundraising requests"; in the tracking of employee participation and regular follow up with employees "concerning their lack of participation"; and in the evaluation of non-participating employee bonuses by "the same manager who generated the lists and demanded their compliance."  Additionally, the Report noted Respondents did not refute Ms. Cochenour's allegation that a manager told her failure to contribute could result in a job-related reprisal.  Consequently, the OGC recommended the Commission find reason to believe that Murray and Murray Energy violated 52 U.S.C. § 30118(a) and 11 C.F.R. § 114.2(f).

49.     The OGC further recommended that the Commission should find that Murray Energy PAC and Michael G. Ruble in his official capacity as treasurer violated 52 U.S.C. § 30118(b)(3)(A) and 11 C.F.R. § 114.5(a)(1) "because MECPAC's disclosure reports indicate

that it received contributions following the coercive solicitations and then made contributions and expenditures."

50.     With regard to the Commission authorizing an investigation into the Report's findings, the OGC stated that a reason-to-believe finding is "appropriate 'in cases where the available evidence in the matter is at least sufficient to warrant conducting an investigation.'" The OGC further stated that "[t]he information available in this matter adequately supports the conclusion that the Respondents may have violated the Act."

51.     Addressing whether Murray Energy violated 52 U.S.C. §§ 30122 and 30118, the OGC stated that no person may "participate in a program that pays employees for their SSF contributions or reimburses them for making campaign contributions."  The OGC found that Murray Energy PAC is an SSF of Murray Energy that received contributions from employees; that Murray Energy employees faced an "implied threat" of "potential job-related reprisals" for not contributing to the SSF; and that their bonuses were evaluated by Murray, who "demanded" they contribute.  Nonetheless, the OGC recommended that the Commission postpone taking action on this matter until after it investigated the alleged violations of 52 U.S.C. § 30118(a) and 11 C.F.R. § 114.2(f).

52.     After the OGC issued its Report, the Commission voted on its recommendations on April 12, 2016.  The Commission deadlocked three to three on the OGC's recommendations. Unable to proceed, the Commission voted five to one to close the file on MUR 6661, dismissing Plaintiffs' complaint.

53.     On May 20, 2016, Vice Chairman Steven T. Walther and Commissioners Ann M. Ravel and Ellen L. Weintraub, who all voted in favor of finding reason to believe the Respondents violated the FECA, issued a detailed Statement of Reasons condemning the

Commission's deadlock and dismissal of the Plaintiffs' complaint.  These Commissioners stated "the Complaint and available documentation clearly demonstrate that there is reason to believe the Respondents committed these serious violations."  Moreover, these Commissioners noted, Respondents' conduct was "pervasive and repetitive in nature," indicating a "planned, persistent pattern of coercing employees to contribute to MECPAC and Murray's preferred federal candidates."  Additionally, they found it "obvious" that the facts alleged and supported by the record warranted further Commission investigation, particularly given that "Respondents minimize the seriousness of the allegations, but do not deny the essential truth of the alleged communication," and that the seriousness paired with "ample and basically uncontroverted evidence" was "more than sufficient to warrant a reason to believe finding, as a matter of law."

54.     In their Statement of Reasons, Commissioners Walther, Ravel, and Weintraub explained the law "merely requires that the Commission find that there is reason to believe a violation *may* have occurred" to trigger an investigation.  "In contrast," they continued, "our colleagues have applied a more stringent standard for finding reason to believe than is legally required."  Ultimately, the Commissioners stated, "[i]f the procedural acts which occurred here are scrutinized in any judicial proceeding in the future, it is our hope that the court will determine and clearly declare that, as a matter of law, there is reason to believe that a violation may have occurred as to each allegation of wrongdoing."

55.     On June 2, 2016, only one week before Plaintiffs' window to seek judicial relief for dismissal of the complaint would close, the remaining Commissioners issued a Statement of Reasons to explain their controlling vote to stymie the OGC investigation.  While Chairman Matthew S. Petersen and Commissioner Caroline C. Hunter and Lee E. Goodman (the "controlling Commissioners") recognized that "coercion of a person's political contributions to a

separate segregated fund is not merely a violation of the law, it is a grave interference of a person's core constitutional rights," they refused to protect Murray Energy's employees from such coercion.  Instead, they rejected the accounts from the three Murray Energy employees who spoke about the coercive threats and solicitations they received at the company, despite the fact that those accounts bore guarantees of reliability in that two of the employees' accounts were recited in a reputable news source, the third was stated in a pleading and in sworn testimony, and all three corroborated each other and were further corroborated by the judgment against Respondents finding that they engaged in other coercive behavior toward Murray Energy employees. Nonetheless, the controlling commissioners belittled the employees' first-hand understanding of the communications because they did not identify "specific threats and reprisals" that could have no other meaning than a threat of physical violence or an imminent termination of employment:  a contrived evidentiary requirement that the controlling commissioners invented without any foundation in law or policy.  While refusing to credit any statement by the three employees, the controlling Commissioners took as indisputable truth the vague denials and self-serving statements of Respondents, even though the Respondents did not squarely deny the factual allegations in Plaintiffs' complaints and, in fact, conceded many of them.

56.     The controlling Commissioners further stated that they voted to dismiss because they found that every solicitation Respondents issued contained a required disclaimer informing the employees that no contribution was in fact required and that no employment decision would rest on their decision to contribute.  Indeed, they relied on that conclusion to distinguish this case from other cases in which the Commission found reason to believe coercion occurred.  Yet they reached that conclusion despite the fact that it is squarely at odds with a record containing two

solicitations letters without any disclaimers.  *See* Exhibit B; Exhibit F at 11–12.  In fact, the controlling Commissioners do not even address the May 2014 letter to Ms. Cochenour, a solicitation which contained no such disclaimer but, rather, demanded that "contributions and the enclosed forms *must* be returned to" Mr. Murray.  Exhibit F at 11–12 (emphasis added).  In addition, the controlling Commissioners assumed, without any basis in the record, that Murray Energy limited its more-than-twice-yearly solicitations to executive and administrative level employees, despite the fact that Mr. Murray himself stated that the solicitations were directed to all "salaried" employees, not merely the company's executives, and the fact that Ms. Cochenour, who alleged she was a "foreman," not an executive or administrator, alleged receiving "frequent" requests.

57.     Moreover, despite the fact that the law outlaws both reprisals and threats of reprisals, the controlling Commissioners treated as dispositive their conclusion—reached only after improperly viewing the evidence in the light most favorable to Respondents—that some employees were not terminated even though they did not contribute and that the three employees did not state that they made a contribution as a result of the coercion.

58.     Finally, with regard to Plaintiffs' allegation that Murray Energy unlawfully used bonuses to make pass-through contributions from its corporate treasury, the controlling Commissioners simply refused to credit the account of a Murray Energy employee that substantiated the allegations or the various admissions of Respondents that supported them. Rather, they accepted Respondents' vague denials of wrongdoing without question, even over the Respondents' admission the bonuses were intended to "incentiv[ize]" contributions.

59.     In sum, in attempting to justify their dismissal of Plaintiffs' complaint, the controlling Commissioners ignored evidence, misstated the record, assumed facts not in the

record, misconstrued the law, and generally failed to act as neutral arbitrators called on solely to

ask whether there existed credible allegations sufficient to show a violation may have occurred

and to warrant an investigation by the OGC.  Indeed, the controlling commissioners' abject

failure to apply the FECA's "reason to believe standard" in a manner consistent with law has led

actors in the campaign finance field to recognize that there is currently "virtually no enforcement

of campaign finance laws."

## PLAINTIFFS' CLAIM FOR RELIEF

### CLAIM ONE
### The FEC's Dismissal of Plaintiffs' Complaint Was Arbitrary, Capricious, an Abuse of Discretion, and Contrary to Law

60.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs as fully

set forth herein.

61.     The FEC's dismissal of the complaint was arbitrary, capricious, an abuse of

discretion, and contrary to law in violation of 52 U.S.C. § 30109(a)(8)(C), and 5 U.S.C. § 706,

because the controlling Commissioners who voted against finding reason to believe Respondents

violated 52 U.S.C. §§ 30118(a), (b), 30122 and 11 C.F.R. §§ 110.4(b), 114.2(f), 114.5(b)(1),

employed a standard far higher than the "reason to believe" standard commanded by the FECA,

52 U.S.C. § 30109(a)(2), to authorize an investigation.

62.     In particular, rather than determine whether Plaintiffs credibly alleged that a

violation of the FECA's prohibitions on coercive contributions may have occurred—the standard

the FEC adopted in construing the FECA's "reason to believe" standard—the controlling

Commissioners cherry-picked the record for any evidence that might support the Respondents'

version of the facts, ignored evidence that contradicted the Respondents and that indicated that

they violated the FECA, and otherwise reached conclusions unsupported by the record.  Contrary

to law, the controlling Commissioners then dismissed Plaintiffs' complaint because they found

that there existed (based on their strained reading of the record) the remotest possibility that

Respondents did not violate the FECA:  a standard wholly at odds with the FECA's low bar to

authorize an investigation into wrongdoing.

63.    The controlling Commissioners further dismissed Plaintiffs' complaint because,

in addition to their impermissible interpretation of the FECA's "reason to believe standard," their

findings of fact based on the record were arbitrary, capricious, and an abuse of discretion, and

thus their dismissal based on those conclusions was contrary to law.  In particular, the controlling

Commissioners reached factual conclusions wholly unsupported by and without any rational

connection to any evidence in the record by, for example, concluding that Murray Energy

employees received no more than two solicitations from Respondents per year.  The controlling

Commissioners also reached factual conclusions that were in direct contradiction to evidence in

the record by, for example, concluding that all solicitations by Respondents included required

disclaimers, despite the fact that the record plainly contained two solicitations without

disclaimers and no investigation had been made of all of Respondents' other solicitations to

ensure that they included the required disclaimer.

64.    The three controlling Commissioners who voted against finding reason to believe

Respondents violated 52 U.S.C. § 30118(a) and 11 C.F.R. § 114.2(f) further dismissed Plaintiffs'

complaint because they employed an unreasonably cramped interpretation of the unlawful

coercion that FECA prohibits, an interpretation that is contrary to law.  The controlling

Commissioners' interpretation would ignore reasonable and widely shared understandings of the

meanings of employer threats, reached by individuals who were aware of the full context of the

statements, and substitute for those understandings the controlling Commissioners' after-the-fact

and out-of-context construction.  The controlling Commissioners' misinterpretation would leave

employees subject to coercion in the exercise of their own constitutional rights, contrary to the purpose and text of the FECA.

65.     The controlling Commissioners' dismissal has denied Plaintiffs and the public accurate and complete information regarding the contributions by Respondents and Murray Energy employees by allowing Respondents to unlawfully make and accept contributions in the name of another and to use coercive techniques to facilitate that subterfuge and to hide unlawful corporate contributions.

66.     Plaintiffs are therefore entitled to relief in the form of a declaratory order that defendant FEC is in violation of its statutory responsibilities under 52 U.S.C. § 30109(a)(8) and 5 U.S.C. § 706 and has acted arbitrary or capriciously, abused its discretion, or acted contrary to law in dismissing MUR 6661.

## REQUESTED RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

(1)     Declare that the FEC's dismissal of MUR 6661 was arbitrary, capricious, an abuse of discretion, and contrary to law;

(2)     Order the FEC to conform to such declaration within 30 days pursuant to 52 U.S.C. § 30109(a)(8)(C);

(3)     Award Plaintiffs their costs, expenses, and reasonable attorneys' fees in this action; and

(4)     Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

ADAM J. RAPPAPORT
(D.C. Bar No. 479866)
Citizens for Responsibility and Ethics
    in Washington
455 Massachusetts Ave. N.W., Sixth Floor
Washington, D.C. 20001
Phone: (202) 408-5565
Facsimile: (202) 588-5020
arappaport@citizensforethics.org

June 10, 2016        *Attorney for Plaintiffs*